IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs December 4, 2018

**MARLO DAVIS v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 07-01813      W. Mark Ward, Judge**

**No. W2017-02127-CCA-R3-PC**

The Petitioner, Marlo Davis, appeals the Shelby County Criminal Court's denial of his petition for post-conviction relief from his second degree murder and reckless homicide convictions. The Petitioner contends that he received the ineffective assistance of counsel. We affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and ROBERT L. HOLLOWAY, JR., JJ., joined.

Jessica L. Gillentine (on appeal), Bartlett, Tennessee, and Seth Seagraves (at the post-conviction hearing), Memphis, Tennessee, for the appellant, Marlo Davis.

Herbert H. Slatery III, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Holly Palmer, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case arises from the 2006 homicide of Quincy Jones, for which the Petitioner and his codefendant were indicted for first degree premeditated murder and first degree felony murder. *See State v. Marlo Davis,* No. W2011-01548-CCA-CD, 2013 WL 2297131 (Tenn. Crim. App. May 21, 2013). The Petitioner was found guilty of second degree murder and reckless homicide at the April 2011 jury trial. The trial court merged the Petitioner's reckless homicide conviction into his second degree murder conviction and sentenced the Petitioner to forty years' incarceration. The Petitioner appealed his convictions and sentence, and this court summarized the facts as follows:

On the date in question, November 9, 2006, the victim was refurbishing one of his rental properties located on the corner of Ely and Essex Streets in Memphis. He drove a Range Rover, which was parked behind the property at the time of the shooting. He died from a gunshot wound to the abdomen.

Laraine Bobo lived diagonally across the street from the victim's rental property. Ms. Bobo testified that, between 3:00 and 3:15 p.m. that day, she was sitting in her driveway waiting for her grandchildren, Jarcquise and Melnitra Spencer, and nephews, David and Demetrius Holloway, to come home from school. As she was waiting, Ms. Bobo observed Clarence "Dusty" Bailey knock on the victim's front door. According to Ms. Bobo, Bailey left when no one answered the door.

Sometime thereafter, Ms. Bobo saw the co-defendant, whom she recognized, standing outside the church located across the street from her house and the victim's house. According to Ms. Bobo, the co-defendant was standing next to a telephone pole with another person, but she could not see the other person's face because he was wearing a jacket with the hood pulled up.

Ms. Bobo testified that she saw Spencer and Holloway, who were ten years old at the time of the shooting, walking together down the street towards her house. As the children were walking, Ms. Bobo heard some people arguing, and although she could not see the argument, she became fearful and yelled at the children to run home. She heard a gunshot as the children were running. After getting the children safely inside, Ms. Bobo saw the victim walking towards her house. Ms. Bobo went to assist the victim, who had been shot in the stomach, and telephoned 9-1-1. She held a towel on the wound, but by the time officers arrived on the scene, the victim was unresponsive.

Ms. Bobo later identified the co-defendant and Bailey from photographic displays. She also gave multiple statements to the police.

Camry Richardson, age fifteen at the time of the shooting, was walking her cousin home from school that day sometime between 3:15 and 3:20 p.m. when she saw the victim speaking with two African-American males. One of the men was wearing a hooded jacket. She could not identify either of them. Richardson was walking towards her house when she heard a gunshot. She saw the victim hunched over and holding his stomach; the other two men were running into an alleyway or shortcut of some kind leading to Miller Street.

Ella Renee Conyers testified that she shared a parking area with the victim behind their respective homes. On November 9, 2006, she was driving down Essex Street towards her house on Miller Street. As she stopped at the stop sign on the corner of Ely and Essex Streets, she observed a man looking in the front door of the victim's property. She continued to drive and saw a second man crouched behind another vehicle belonging to her and parked at her residence. According to Conyers, the man, realizing she was looking at him, stood up. She did not recognize him. She then parked off Miller Street in front of her house and saw a third man across the street from the church. Conyers said this man was watching her as she parked her car. He was taller than the man crouched behind her vehicle and was of medium build. She opined that both men were over eighteen years of age. After parking her vehicle, Conyers first went inside to check on her dog and then was going to check on the other vehicle when she heard a gunshot. She went outside and learned that the victim had been shot.

Demetrius Holloway, who was fifteen years old at the time of trial, testified that he was walking home from school with family members on November 9, 2006. As he was walking with his cousin Spencer, he saw two men sitting beside the church across the street from his aunt's house. According to Holloway, Spencer briefly shook hands with the men before they continued on their route home. Holloway did not know the two men but observed that one of the men was wearing a hooded sweatshirt. As they were walking, Holloway saw the two men walk across the street to a third man, and the three of them began to argue. Holloway testified that he saw the man wearing the hooded sweatshirt pull out a gun and that, as he was running to his aunt's house, he heard a gunshot. Holloway said the third man, who had been shot, then ran to his aunt's driveway, holding his stomach, and thereafter collapsed. Holloway testified that he did not see where the two men went after the shooting.

Clarence Bailey testified that around 2:30 or 3:00 p.m. on November 9, 2006, he was walking on Essex Street towards Ely Street looking for some work to do. Bailey admitted that he was addicted to cocaine and seeking money to purchase more cocaine. He further admitted that he had been using cocaine earlier that day.

As Bailey was walking, he encountered the [Petitioner] and co-defendant on the sidewalk, both of whom he had known since they were children. Bailey recalled that the [Petitioner] was wearing a hooded, pullover jacket, but he could not remember if the [Petitioner] had the hood

-3-

up over his head. After exchanging greetings with the two men, Bailey continued walking through the neighborhood.

Bailey saw the victim's property and went and knocked on the front door. No one answered. He left. After turning the corner onto Essex Street, Bailey saw a white car drive past him, traveling at a slow rate of speed. According to Bailey, the driver was watching something to the left before turning and looking at Bailey "dead in [his] face." As he continued walking down Essex Street, Bailey saw the [Petitioner] crouched behind the victim's Range Rover and the co-defendant crouched behind the car parked next to the Range Rover. Bailey kept walking and then heard a gunshot. He turned around to see what was going on and saw the co-defendant walk from behind the car in the direction of the commotion. Bailey then ran.

Bailey later gave two statements to the police. According to Bailey, he was truthful in both statements but omitted some information in the first statement because he was reluctant to get involved. Bailey identified the [Petitioner] from a photographic display as "one of the guys . . . stooped behind the truck." He also identified the co-defendant. Bailey said that his police statements were consistent with his testimony.

Jarcquise Spencer, who was fifteen years old at the time of trial, testified that he had little recollection of the events of November 9, 2006, recalling only that the victim collapsed in his grandmother's front yard and getting a towel to stop the bleeding. He further did not remember giving a statement to the police, viewing photographic displays, or testifying at the preliminary hearing in this matter.

The recording of his statement was played in-court, and Spencer still could not remember any of the details surround his testimony at that hearing. He was able to confirm that it was his voice on the recording. The recording was admitted as an exhibit.

Spencer also examined his statement taken by Sergeant Anthony Mullins at the police station several days after the shooting; however, such examination was unhelpful in refreshing Spencer's recollection about the contents of the statement or the events of the shooting. Spencer was able to identify his signature at the bottom of the statement next to his mother's. His statement was then read for the jury. In the statement, Spencer identified the [Petitioner] as the shooter and stated that the [Petitioner] was accompanied by his codefendant during the shooting. When asked if the [Petitioner] said anything to the victim before firing upon him, Spencer said the following:

Spencer: No, sir. I mean he was like, "Give it to me!"

Sgt. Mullins: Did [the victim] say anything to [the Petitioner]?

Spencer: Yes. He said, "No, don't do me like this!" and he had his arms raised up (indicates this with both hands raised in a gesture of surrender or compliance).

Sgt. Mullins: Did [the co-defendant] say anything to [the victim] or to [the Petitioner]?

Spencer: No. He was just standing beside [the Petitioner].

Spencer also told Sgt. Mullins that the [Petitioner] was wearing a hooded sweatshirt with the hood up but that he could still see his face.

Sgt. Mullins also asked Spencer about previously viewing several photographic displays and preparing a sketch of the scene in the statement. Spencer confirmed that Sgt. Mullins had previously interviewed him at his grandmother's house and that he had positively identified several individuals from photographic displays at that time. Additionally, Spencer confirmed that, in this prior interview, he had also identified the locations of various individuals on a crime scene diagram prepared by Sgt. Mullins. The statement was admitted as an exhibit.

At trial, Spencer was also shown the four photographic displays he reviewed with Sgt. Mullins just following the shooting; however, Spencer could not remember identifying anyone in those displays by the time of trial. Spencer's signature appeared on the "Advice to Witness Viewing Photographic Display" form, along with his initials and handwritten notations of positive identifications in the displays. Moreover, Spencer confirmed that his initials and handwriting appeared on the displays; the displays were also signed and dated with a time notation. In the displays, Spencer identified Bailey as the man he saw walking; the [Petitioner] as the man who pointed the gun at the victim; and the co-defendant as the man accompanying the [Petitioner]. The advice form and displays were admitted as exhibits.

Additionally, the crime scene diagram, wherein Spencer identified his, the victim's, the [Petitioner's], the co-defendant's, and Bailey's locale[s] at the time of the shooting, was admitted as an exhibit. Spencer's signature appeared on the diagram, but at trial, he did not recall the sketch.

Neither the [Petitioner] nor his co-defendant presented any proof.

*Id*. at *1-4. This court affirmed the Petitioner's convictions and sentence. The Petitioner appealed, and our supreme court affirmed. *State v. Davis*, 466 S.W.3d 49 (Tenn. 2015).

The Petitioner filed a pro se petition for post-conviction relief, and an amended petition was filed by post-conviction counsel. The Petitioner raised multiple grounds of ineffective assistance of counsel. However, the only issues the Petitioner raises on appeal are whether he received the ineffective assistance of counsel because (1) trial counsel did not call an expert witness to rebut Mr. Spencer's testimony and (2) counsel failed to ensure the Petitioner received a speedy trial. We limit our review to these issues.

At the August 18, 2017 post-conviction hearing, the Petitioner testified that he was indicted for first degree premeditated murder in 2007, that his trial was in 2011, and that he was convicted of second degree murder and reckless homicide. The Petitioner said that he was sentenced as a Range II offender and that he received the maximum forty-year sentence.

The Petitioner testified that he was incarcerated about five years while awaiting trial, that he usually only saw trial counsel during court proceedings, and that he met with a private investigator a couple of times. The Petitioner stated that counsel met with him in the jail one or two times for about thirty minutes "at the most." The Petitioner said that his defense at the trial was that he was not at the scene during the incident and that he was not guilty. The Petitioner stated that his defense was based on discrediting witness testimony.

The Petitioner testified that Jarcquise Spencer stated at the preliminary hearing he saw the Petitioner shoot the victim.[1] The Petitioner stated that Mr. Spencer testified at the trial that he could not recall the incident, that the prosecutor claimed Mr. Spencer lied on the stand because Mr. Spencer recalled the incident the week before the trial. The Petitioner said that he did not think Mr. Spencer lied during the trial.

The Petitioner testified that trial counsel hired an expert to discredit Mr. Spencer's testimony and that he believed counsel was going to call the expert to testify. The Petitioner stated that the week before the trial, counsel said she was not going to call the expert and that counsel did not cross-examine Mr. Spencer because Mr. Spencer said he did not recall the incident. The Petitioner said that counsel represented him on appeal and that counsel raised "some" issues relative to Mr. Spencer.

---

[1] The spelling of the witness's name appears in the record as "Jarquez." For consistency, we use the spelling reflected in this court's previous opinion.

The Petitioner testified that trial counsel had "abandoned him," that counsel should have met with him more before the trial, and that counsel should have cross-examined Mr. Spencer. The Petitioner said that counsel withdrew after the Petitioner's convictions and sentence were affirmed on appeal and that he felt "abandoned." The Petitioner stated that counsel did not object during the State's closing argument.

On cross-examination, the Petitioner testified that he appeared in court many times while awaiting trial and that trial counsel "sometimes" met with him at the courthouse. The Petitioner stated that counsel decided not to call the expert to testify and that he disagreed with counsel's decision. The Petitioner did not recall a conversation with counsel relative to whether the expert should testify. The Petitioner stated that counsel should have cross-examined Mr. Spencer, that the Petitioner wrote questions he believed counsel should have asked Mr. Spencer, and that the Petitioner did not recall the questions. The Petitioner said that he was indicted for first degree premeditated murder and first degree felony murder and that he could have received a life sentence if he were convicted of those crimes.

On redirect examination, the Petitioner testified that after the State rested its case, he spoke with trial counsel and that counsel said she did not want to call the expert witness. The Petitioner stated that he trusted counsel's opinion at the time because she was his attorney.

Trial counsel testified that she was a solo practitioner and that she had practiced law for twenty-four years. Counsel stated that she was death penalty qualified and that she had represented clients in about fifteen or twenty murder cases. Counsel said that the Petitioner had been represented by two previous attorneys, that each attorney withdrew, and that she represented the Petitioner for about eighteen months. Counsel stated that the Petitioner appeared in court about fifteen times and that she met with the Petitioner each time. Counsel said that she visited the Petitioner in jail five or six times, that an investigator was appointed, and that the investigator conducted interviews. Counsel stated that she usually met with clients in jail for about one hour and that sometimes the meetings were longer. Counsel said that during the meetings with the Petitioner, they discussed the Petitioner's case, possible defenses, and plea offers.

Trial counsel testified that the investigator interviewed about ten or fifteen witnesses, that she received a written memorandum relative to each interview, and that she met with the investigator. Counsel stated that one of the Petitioner's defenses was that he was not present at the scene and that she tried to provide the jury with an alternative person who committed the shooting. Counsel said that she tried to "cast the light on Clarence Bailey," that Mr. Bailey was arrested in Tennessee for a first degree murder that occurred in Texas, and that Mr. Bailey was serving a life sentence at the time of the trial. Counsel stated that Mr. Bailey testified for the State and that she presented evidence of Mr. Bailey's criminal history.

Trial counsel testified that she hired an identification expert and that the expert was prepared to testify at the trial. Counsel stated that as the trial progressed, she "determined . . . as a strategic matter that presenting [the expert] testimony" was not in the Petitioner's best interest. Counsel said that calling the expert would have drawn attention to Mr. Spencer's testimony and that Mr. Spencer testified that he could not recall the incident. Counsel stated that "as a strategic decision as [the Petitioner's] attorney[,] I made a legal decision not to call" the expert. Counsel said that she discussed her decision with the Petitioner and that she told the Petitioner it was not in his best interest for the expert to testify. Counsel stated that the Petitioner appeared to agree with her decision and that the Petitioner relied on her legal advice.

Trial counsel testified that Mr. Spencer was the primary witness and that he was the only witness who "put the gun in [the Petitioner's] hands." Counsel stated that the defense theory was that the Petitioner was not present, that she relied on Mr. Spencer's stating he did not recall the incident, and that she argued no reliable witnesses identified the Petitioner. Counsel said that if the expert had testified, the expert would have relied on evidence "draw[ing] attention to the factual basis" of Mr. Spencer's testimony and that she wanted to focus on Mr. Spencer's testimony that he could not recall the details of the incident.

Trial counsel testified that she did not object during the State's closing argument because it was not in the Petitioner's best interest. Counsel stated that she did not know Mr. Spencer was going to testify that he did not recall the details of the incident. Counsel said that a jury-out hearing was held after Mr. Spencer said he did not recall the incident, that Mr. Spencer was allowed to review his previous statement, and that the trial court addressed him about whether he recalled the incident. Counsel stated that Mr. Spencer was permitted to take his statement home overnight to review and that Mr. Spencer said he did not recall the incident again the next morning. Counsel said that the court allowed her and the prosecutor to ask Mr. Spencer whether he could recall the incident, that Mr. Spencer testified he did not recall it, and that the court permitted the State to introduce Mr. Spencer's preliminary hearing testimony and prior statement. Counsel stated that she argued Mr. Spencer's prior statements should not have been presented to the jury, that the court permitted the statements over her objection, and that she appealed on this basis.

On cross-examination, trial counsel testified that Mr. Bailey stated he went to the front door of the victim's home and that the victim did not answer. Counsel said Mr. Bailey saw the Petitioner and the codefendant speaking with victim. Counsel stated that she decided not to call the expert and that the expert would have testified that misidentification "potentially happened in this case." Counsel said that she retained the expert to rebut Mr. Spencer's witness testimony and that her strategy changed because Mr. Spencer said he could not recall the incident. Counsel stated that she researched the law related to the evidentiary issue regarding Ms. Spencer's prior statement. Counsel

recalled the State's closing argument and said that she rarely objected during closing arguments and that she did not believe the State's argument warranted an objection.

The post-conviction court entered a written order denying relief. The court found that trial counsel hired an expert to testify at the trial relative to Mr. Spencer's identification of the Petitioner. The court determined that counsel did not call the expert to testify, as a matter of trial strategy, after Mr. Spencer testified that he did not recall the incident. The court stated that the expert was not called at the post-conviction hearing and that the court would not speculate what the testimony would have shown. The court found that the Petitioner failed to show counsel's performance was deficient and that he was prejudiced by any deficiency. This appeal followed.

The Petitioner contends that trial counsel provided the ineffective assistance of counsel by failing to call the expert to testify at the trial. The Petitioner argues that counsel decided not to call the expert after Mr. Spencer testified that he could not recall the incident and that counsel made "the last-minute decision without proper investigation or preparation." The Petitioner asserts that Mr. Spencer's preliminary hearing testimony and Mr. Spencer's prior police statement were read into evidence and that counsel should have called the expert to discredit the evidence. The State responds that the Petitioner failed to prove that counsel provided deficient performance and that the Petitioner was prejudiced.

Post-conviction relief is available "when the conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2012). A petitioner has the burden of proving his factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f) (2012). A post-conviction court's findings of fact are binding on appeal, and this court must defer to them "unless the evidence in the record preponderates against those findings." *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *see Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's application of law to its factual findings is subject to a de novo standard of review without a presumption of correctness. *Fields*, 40 S.W.3d at 457-58.

To establish a post-conviction claim of the ineffective assistance of counsel in violation of the Sixth Amendment, a petitioner has the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). The Tennessee Supreme Court has applied the *Strickland* standard to an accused's right to counsel under article I, section 9 of the Tennessee Constitution. *See State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner must satisfy both prongs of the *Strickland* test in order to prevail in an ineffective assistance of counsel claim. *Henley*, 960 S.W.2d at 580. "[F]ailure to prove

either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). To establish the deficient performance prong, a petitioner must show that "the advice given, or the services rendered . . . , are [not] within the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975); *see Strickland*, 466 U.S. at 690. The post-conviction court must determine if these acts or omissions, viewed in light of all of the circumstances, fell "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. A petitioner "is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision." *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *see Pylant v. State*, 263 S.W.3d 854, 874 (Tenn. 2008). This deference, however, only applies "if the choices are informed . . . based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). To establish the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

The Petitioner did not present the expert's testimony at the post-conviction hearing, and this court will not speculate what the testimony would have shown. *See Black v. State*, 749 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Furthermore, trial counsel's testimony at the post-conviction hearing reflects that she hired an expert to rebut Mr. Spencer's testimony and that the expert was prepared to testify. When Mr. Spencer testified at the trial that he did not recall the incident, counsel made a strategic decision not to call the expert. Counsel discussed her decision with the Petitioner, and the Petitioner appeared to agree with her. Counsel wanted to focus on Mr. Spencer's testimony that he did not recall the incident and that the expert's testimony would have drawn attention to the "factual basis" of Mr. Spencer's testimony. Counsel argued no reliable witnesses identified the Petitioner as the perpetrator. The record does not preponderate against the post-conviction court's determination that counsel's representation was not deficient and the Petitioner failed to show any deficiency resulted in prejudice. The Petitioner failed to establish his ineffective assistance of counsel claim and is not entitled to relief on this basis.

The Petitioner contends, for the first time on appeal, that trial counsel was ineffective for failing to "ensure the Petitioner received a speedy trial." The State responds that this issue is waived because the Petitioner did not raise this issue in his post-conviction petition. We agree with the State.

This issue was not raised in the Petitioner's pro se or amended post-conviction petitions. Likewise, no evidence was presented at the post-conviction hearing regarding this issue, and the post-conviction court did not address it in its order. Consideration of

this issue is waived. *See, e.g.*, *Cauthern v. State*, 145 S.W.3d 571, 599 (Tenn. 2004) ("[A]n issue raised for the first time on appeal is waived.").

The judgment of the post-conviction court is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE